**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TEMUR KADIROV and | : | |
| KHUSAN KADIROV, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | No. 13-cv-7390 |
| v. | : | |
| | : | |
| RAND BEERS et al., | : | |
| Defendants. | : | |

**MCHUGH, J.**                                                    **DECEMBER 4, 2014**

<u>MEMORANDUM</u>

This is a case brought by two brothers seeking naturalization.  They have held Lawful
Permanent Resident (LPR) status for the requisite number of years, which they obtained
derivatively from their father.  Unfortunately for the brothers, their father was deported because
he had obtained asylum by fraudulent means and subsequently engaged in a pattern of criminal
conduct.  The question presented is as old as Deuteronomy,[1] whether the sins of the father are
then visited upon his sons.  For purposes of federal immigration law, I am constrained to
conclude that the answer is yes, with the result that Plaintiffs are ineligible for naturalization.

**I.       Factual Background**

Plaintiffs Temur and Khusan Kadirov seek naturalization.  Their odyssey begins with
their father, Akbar Kadirov, who entered the United States after having been granted asylum on
September 4, 1998.  Joint Statement of Facts ¶¶ 1, 4.  Akbar then filed an application in October,
1999, to adjust his status to that of lawful permanent resident, which was approved in 2004.  <u>Id.</u>
at ¶¶ 5, 6.  In the meantime, Akbar had claimed Temur and Khusan as his children and they

---

[1] Deuteronomy, 5:9.

entered the United States as derivative asylees in late 2000.  Id. at ¶¶ 7, 8.  Plaintiffs filed for adjustment of status seeking LPR status as derivatives of their father's status, id. at ¶ 10, and their adjustments were granted in 2005 and 2006.  Id. at ¶¶ 11-14.

After Plaintiffs had obtained their LPR statuses, their father Akbar was charged with conspiracy, visa and asylum fraud, and conspiracy to commit money laundering stemming from his participation in a fraudulent immigration conspiracy.  Id. at ¶ 15.  Akbar was additionally charged with possession of an alien registration card procured by fraud.  Id. at ¶ 16.  Specifically, the indictment alleged that Akbar had provided false information regarding the date of his initial entry to the United States, falsely claimed to have been a member of a Jewish congregation in Brooklyn, New York, falsely claimed that his wife had been beaten and abused by Uzbekistan nationals for being a Jewish woman, and falsely claimed that his wife had resigned from work after the alleged incident.  Id. at ¶ 18.  As a result, Plaintiffs' father had obtained his asylum status through fraudulent means.  Id. at ¶ 17.

On June 22, 2009, Akbar pled guilty to Conspiracy, Conspiracy to Commit Money Laundering, and Possession of an Alien Registration Card Procured By Fraud in the United States District Court for the Eastern District of Pennsylvania.  Id. at ¶ 19.  On March 16, 2011, Akbar was ordered to be removed from the United States, and an Immigration Judge sustained the removal order because Akbar had been inadmissible at the time of his entry to the United States as a result of his fraudulent application.  Id. at ¶¶ 20-22.  Despite their father's checkered history, the Government has never alleged that Plaintiffs were involved his fraudulent or criminal activities.  Id. at ¶ 24.

United States Immigration and Customs Enforcement (ICE) initiated separate removal proceedings against Plaintiffs and the rest of Akbar's family in 2009.  Id. at ¶ 25.  Those

proceedings charged that Plaintiffs were inadmissible at the time of their entry and were therefore never lawfully entitled to asylum. Id. at ¶ 26. On January 13, 2012, a joint motion to terminate the proceedings against Plaintiffs and their family was filed by both the Government and Plaintiffs' counsel. Id. at ¶ 27. United States Citizenship and Immigration Services (USCIS) specifically stated that the termination was due to humanitarian considerations, not a failure to sustain the removal charges. Id. Regarding Temur, the motion stated that he would "be allowed to proceed currently for naturalization, these proceedings having been terminat[ed] without prejudice." Id. at ¶ 28. Regarding Khusan, the motion stated that "the proceedings [would] be withdrawn without prejudice and that for present proceedings his defense of insanity [would] not be raised." Id. at ¶ 29. Plaintiffs agreed that they would not petition for an immigrant visa for their father. Id. at ¶¶ 28, 29. The motion also provided that "in making this agreement no Respondent nor their counsel agree that any of the pending charges are true or correct but only that the interest of justice are well served by the terms of this agreement." Id. at ¶ 30. The motion to terminate was granted. Id. at ¶ 31. For all practical purposes, the termination of the removal proceedings simply deferred the issue of citizenship to a later time.

Plaintiffs have now filed for naturalization. Id. at ¶ 32. USCIS denied both Plaintiffs' applications. Id. at ¶ 34. The USCIS denials stated that because Akbar had obtained his permanent resident status as an asylee through fraud, neither Plaintiff was entitled to the asylum status derived from Akbar. Id. at ¶ 35. Therefore, USCIS concluded, Plaintiffs were not eligible to adjust their status to that of lawful permanent resident, and thus were not lawfully admitted as permanent residents. Id. Plaintiffs appealed the decision and USCIS affirmed the denial of Plaintiffs' naturalization applications. Id. at ¶¶ 36, 37. Plaintiffs have now filed the complaint in this Court seeking a *de novo* review of USCIS' denial of their applications for naturalization. Id.

3

at ¶ 38.  Presently, Plaintiffs and Defendants have filed cross-motions for summary judgment.
Because no issues of material fact exist, I reach the merits of these motions and determine that
under controlling precedent Plaintiffs are not eligible for naturalization.

## II.    Discussion

In accordance with the Immigration and Naturalization Act (INA), an alien may become
eligible for naturalization after he or she has resided in the country continuously for a period of
five years following lawful admission as a permanent resident.  8 U.S.C. § 1427(a).  Once
eligible, an alien may apply for naturalization, but the burden falls upon the applicant to show
that he or she has complied with the substantive requirements set forth by statute.  8 U.S.C. §
1429.  As a result of this burden, "doubts should be resolved in favor of the United States and
against the claimant."  Berenyi v. District Director, INS, 385 U.S. 630, 637 (1967).

The section of the INA specifically entitled "Prerequisite to Naturalization" provides that
"no person shall be naturalized unless he has been lawfully admitted to the United States for
permanent residence in accordance with all applicable provisions of this chapter."  8 U.S.C. §
1429.  The phrase "lawfully admitted for permanent residence" is the centerpiece of the dispute
before this Court.  The INA definitions provide that "[t]he term 'lawfully admitted for permanent
residence' means the status of having been lawfully accorded the privilege of residing
permanently in the United States as an immigrant in accordance with immigration laws . . . ."  8
U.S.C. § 1101(a)(20).

Plaintiffs take the position that once an immigrant has been granted LPR status, they have
met the requirements for naturalization.  In Plaintiffs' view, the notion that one can be an
"unlawful Lawful Permanent Resident" is an oxymoron, as one cannot be both lawful and
unlawful at the same time.  As a matter of English prose, Plaintiffs are correct.  However, for

4

purposes of immigration law, the term "Lawful Permanent Resident" is a legal term of art, and there is a substantial body of precedent holding that it is not the status that an immigrant holds which is determinative of his or her right to naturalization, but rather the basis on which such status was conferred, and specifically whether the immigrant was substantively qualified.

Various courts have recognized that an alien may obtain LPR status without having been lawfully admitted or qualified for permanent residence.  As the Second Circuit has expounded, "an alien whose status has been adjusted to lawful permanent resident but who is subsequently determined in an immigration proceeding to have originally been ineligible for that status has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, *ab initio*, never to have obtained permanent resident status.'"  De La Rosa v. DHS, 489 F.3d 551, 554 (2d Cir. 2007) (quoting In re Koloamatangi, 23 I. & N. Dec. 548, 551, 2003 WL 77728 (BIA 2003)).

Following this reasoning, courts typically evaluate whether an alien was actually eligible for LPR status at the time it was awarded in cases where the validity of that LPR status is controlling.  This line of inquiry initially began in cases where the LPR status of an alien was in question as a result of alleged fraud in obtaining that status.  See Koloamatangi, 23 I. & N. Dec. at 548-49 (Even where an alien is "facially and procedurally in lawful permanent resident status for more than the requisite number of years, he was never, in a legal sense, an alien 'lawfully admitted for permanent residence,' because his acquisition of that status was procured by fraud."); Gallimore v. Att'y Gen., 619 F.3d 216, 223 (3d Cir. 2010) (quoting Koloamatangi); Adegoke v. Fitzgerald, 784 F. Supp. 2d 538, 541 (E.D. Pa. 2011) ("Having misrepresented his immigration history in order to obtain his LPR status, Adegoke's LPR status is void *ab initio*. Adegoke was thus never 'lawfully admitted for permanent residence,' and is ineligible for naturalization.").

5

Many circuits have expanded this line of reasoning to cases in which the alien seeking naturalization is innocent of fraud or wrongdoing.  In <u>Savoury v. Att'y Gen.</u>, 449 F.3d 1307 (11th Cir. 2006), the court found that, for the purposes of a removal hearing, an alien was not lawfully admitted for permanent residence where he had been granted LPR status even in spite of the fact that authorities were aware of a criminal conviction that should have made him ineligible.  <u>Id.</u> at 1317.  Similarly, in <u>Arrellano-Garcia v. Gonzales</u>, 429 F.3d 1183 (8th Cir. 2005), an ineligible alien who had obtained LPR through proper procedure upon the mistake of authorities was deemed to have never "lawfully" acquired the status through that mistake.  <u>Id.</u> at 1187.  Further, <u>In re Longstaff</u>, 716 F.2d 1439 (5th Cir. 1983), held that an ineligible alien who had received LPR status because of a mistake he made in completing his application was not lawfully admitted for the purposes of naturalization.  <u>Id.</u> at 1441-42.

<u>Gallimore</u> controls here.  In <u>Gallimore</u>, the Third Circuit embraced the above reasoning, concluding that "[w]here an alien obtains LPR status through administrative oversight—despite being ineligible for that status for one reason or another, . . . the alien has not been 'lawfully admitted for permanent residence.'"  619 F.3d at 223-24.  Indeed, the court could "discern no principled distinction between (1) finding a status adjustment not 'lawful' because the applicant procured it through fraud; and (2) finding a status adjustment not 'lawful' because the applicant was not legally entitled to it for any other reason."  <u>Id.</u> at 224.

Two circuit cases stand out as particularly compelling because they dealt with aliens who received LPR status on the basis of another's fraudulent actions: <u>Walker v. Holder</u>, 589 F.3d 12 (1st Cir. 2009), and <u>Shin v. Holder</u>, 607 F.3d 1213 (9th Cir. 2010).  In <u>Walker</u>, an alien who had received LPR status faced a removal action.  When the Government contested whether he was lawfully admitted for permanent residence despite having LPR status, the applicant replied that

he had not committed any wrongdoing in obtaining that status and was in fact a minor when he entered the United States.  589 F.3d at 21.  The First Circuit rejected the position that personal culpability was required to defeat naturalization.  It based its decision on policy considerations: "if Petitioner was considered to have been lawfully admitted for permanent residence, then fraud or misrepresentation of third parties applying on his behalf would be encouraged."  Id. at 21-22.

Shin is equally on point.  There, two siblings had obtained LPR status derivatively through their mother, who had also been declared a lawful permanent resident.  Shin, 607 F.3d at 1215.  Unbeknownst to the children, the mother had obtained her LPR status through fraud.  Id. The Ninth Circuit examined whether the children were removable and whether they were eligible for § 212(k) relief.  Id. at 1216.  In determining that the children were removable, the court observed that the validity of their LPR status was dependent on the validity of their mother's LPR status because they had obtained their LPR status derivatively.  Id. at 1216.  The court then held that the mother was removable because she was never "lawfully admitted for permanent residence" despite her LPR status because of the underlying fraud upon which that status was improperly granted.  Id. at 1217.

As in Walker, the children argued that they were lawfully admitted despite their mother's status because they personally had not engaged in any sort of fraud.  Id.  However, the Ninth Circuit read previous case law to "broadly deem all grants of LPR status that were not in substantive compliance with the immigration laws to be void ab initio."  Id. (relying upon Koloamatangi, 23 I. & N. Dec. at 550, and Monet v. INS, 791 F.2d 752, 753 (9th Cir. 1986)). The mother was never lawfully admitted, and the children were not substantively qualified for admission because their admission was derivative and based upon their mother's unlawful admission.  Based upon this logic, the children were found to be removable.  Id.

While Longstaff dealt with naturalization, the other cases cited have involved petitioners seeking relief from deportation for which "lawful admission for permanent residence" was a condition-precedent to cancellation of deportation under 8 U.S.C. § 1229b(a).  In both contexts, the courts were interpreting "lawful admission for permanent residence" as it is used within the INA.  De La Rosa, 489 F.3d at 554; 8 U.S.C. § 1101(a)(20); see also 8 C.F.R. § 1.1(p).  Congress has specifically declared that "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence," and there does not appear to be, nor have the Plaintiffs offered, any reason that this phrase should be interpreted differently in the context of naturalization.  8 U.S.C. § 1429.

There is no dispute in this case that Plaintiffs' father was granted asylum and LPR status on the basis of fraudulent misrepresentations which resulted in his eventual deportation.  It is also undisputed that Plaintiffs entered the United States as derivative asylees, and were granted adjustment of status to LPR solely as derivatives of their father's status.  The precedent reviewed above compels the conclusion that because Plaintiffs' father was not lawfully admitted for permanent residence, Plaintiffs derivatively were not as well.  Though Plaintiffs will maintain their LPR status, they are not eligible for naturalization as provided by statute.

Plaintiffs contend that the Government, having terminated the deportation proceedings, cannot now dispute their LPR status.  Plaintiffs' argument in this regard appears to be partly grounded in principles of due process and partly grounded in principles of estoppel.  To buttress their argument, Plaintiffs suggest that the basis for resolving the removal proceeding was not, in fact, humanitarian, but rather for some other tactical reason.  However, when asked at oral argument, counsel for Plaintiffs could not advance a defense against removal that would have been available to the Kadirov brothers if proceedings had gone forward at the time.  Plaintiffs

further rely on <u>Savoury</u>, <u>supra</u>, 449 F.3d at 1319, for their estoppel argument, but the Eleventh Circuit was careful to point out that the Supreme Court has not determined whether estoppel may apply against the government, further stating that even if estoppel did apply, it would require affirmative misconduct on behalf of the Government.  <u>Id.</u>  In fact, in its disposition of the case, the Court declined to estop the government.   Here, the government's joinder in the Motion to Terminate the Removal Proceedings cannot be construed to make any affirmative misrepresentation regarding Plaintiffs' substantive eligibility to naturalize—rather, the motion spoke only to procedural posture  of  naturalization.  Plaintiffs go on to invoke the" law-of-the-case" doctrine, but technically it applies only  to "the same issues in subsequent stages of the same case."  <u>ACLU v. Mukasey</u>, 534 F.3d 181, 187 (3d Cir. 2008).  This naturalization proceeding is not part of the same action as the prior removal proceeding.

The fact that the Government agreed to terminate removal proceedings against Plaintiffs and grant them LPR status has no effect on their eligibility for naturalization.  The Third Circuit's decision in <u>Gallimore</u> stands squarely in Plaintiffs' way, and they have offered no path around it.  "Admission is not lawful if it is regular only in form.  The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity."  619 F.3d at 223 n.6.

The context in which Plaintiffs obtained their LPR status bears mentioning.  On the record before me, Plaintiffs were not factually eligible for LPR status at the time it was granted to them.  The Government, in terminating the removal proceedings against Plaintiffs, allowed them to retain their LPR status rather than be removed from the country—which would appear to have been the near-certain outcome of such a proceeding since no alternative basis for conferring such status has been offered.  Although, for present purposes, Plaintiffs are victims of their

father's fraud, they have also been the beneficiaries of that fraud, because it allowed them to gain entry into the United States.

I am concerned by the implications of Plaintiffs' argument in two respects.  First, to the extent that Plaintiffs have already been protected by the Government's largesse in stopping removal proceedings, as appears to be the case, preventing the Government from arguing Plaintiffs' eligibility would give unfortunate credence to the aphorism that "no good deed goes unpunished."  More significantly, however, I am concerned that irrevocably binding the Government to waiving objections to citizenship whenever it decides not to go through with removal proceedings, would likely result in immigration officials showing less forbearance when faced with cases such as this one, resulting in more deportations.  Given the strictures of the Immigration and Naturalization Act, and the rigor with which the appellate courts have enforced its literal requirements, a ruling that might dissuade immigration officials from exercising their discretion to mitigate a harsh result under appropriate circumstances, is one to be avoided.

### III.    Conclusion

In light of the above, Plaintiffs are not eligible for naturalization.  Plaintiffs' Motion for Summary Judgment will be denied and Defendants' Motion for Summary Judgment will be granted.  An appropriate order follows.


         /s/ Gerald Austin McHugh
United States District Court Judge